195 P.2d 86

**FLOECK et al. v. HOOVER.**

No. 5087.

Supreme Court of New Mexico.

April 27, 1948.

Rehearing Denied July 12, 1948.

Williams & Beimfohr, of Tucumcari, for appellant.

Rodey, Dickason & Sloan, Frank M. Mims and Jackson G. Akin, all of Albuquerque, for appellee.

COMPTON, Justice.

Plaintiff's intestate, Gerald M. Floeck, was killed as a result of a collision between a bucking horse he was riding, and an automobile driven by defendant, at a point on highway 66 near the Cory-Penn Filling Station, immediately west of Tucumcari, New Mexico. The case was submitted to a jury upon the issues of the negligence of the defendant and the contributory negligence of the deceased. The trial court refused to instruct the jury on the issue of last clear chance. The jury returned a verdict for the defendant and following the overruling of a motion for a new trial, judgment was entered in accordance with the verdict.

Three grounds are urged for a reversal of the judgment. First, the refusal of the court to instruct the jury on the doctrine of last clear chance; second, in refusing to submit to the jury the issue of whether the scene of the collision was a business or resident district; and third, in refusing to grant a new trial on the ground of newly discovered evidence.

Since we are called on to determine whether the trial court committed error in its refusal to give an instruction on the doctrine of last clear chance, it is well to announce those factual matters as will present such an issue. It must appear, (1) that plaintiff has been negligent, (2) that as a result of his negligence he is in a position of peril from which he cannot escape by the exercise of ordinary care, (3) that the defendant knows or should have known of plaintiff's peril, and (4) that defendant then had a clear chance, by the exercise of ordinary care, to avoid the injury, and that he failed to do so. Palmer v. Tschudy, 191 Cal. 696, 218 P. 36; Bence v. Teddy Taxi Co., 112 Cal.App. 636, 297 P. 128.

A review of the facts is necessary. The deceased was riding in a borrow pit on the south side of the highway, traveling in an easterly direction. The defendant also was driving in an easterly direction, at a speed of 30 to 35 miles per hour. About the time the defendant passed the filling station, and about 35 feet before he had overtaken the horse and its rider, the horse began to buck. It bucked out of the borrow pit onto the highway. The defendant, becoming aware of the deceased's perilous position, immediately applied his brakes, and at the same time swerved the automobile abruptly to the left, or north side of the highway. The horse continued bucking in the direction of the defendant's on-coming automobile, and bucked into the automobile at about the center of the black top, or the middle of the highway. The force of the impact dented

the right front fender, the right door, and broke the glass out of the right front door. Defendant's car came to a stop about 20 or 30 feet east of the impact on the north side and parallel to the highway, with both left wheels off the black top.

It is further shown in evidence that the widow of the deceased, an eyewitness to the accident, immediately thereafter stated that the defendant pulled to the left and tried very hard to get out of the way of the horse; that the defendant did everything he could to avoid being hit by the horse, and that she was afraid that the defendant was going to turn his car over or wreck it in trying to get out of the way of the horse.

From a consideration of this evidence, it clearly appears that an issue on the last clear chance doctrine is not presented. The law does not require a defendant to exercise a greater care than that required of plaintiff for his own safety. Nevertheless, the evidence shows that the defendant exercised more than ordinary care, yet failed to avoid the injury. Consequently, the fourth element, as a basis of the doctrine is absent.

In his brief, the plaintiff quotes what he says is the testimony of the defendant to support his claim that he was entitled to an instruction submitting the issue of the last clear chance doctrine to the jury, as follows: "A. I could have stopped my car within 50 feet.

"Q. As I understand it, you were approximately at the west edge of this driveway, proceeding east, at the time when you saw the horse start to buck and pitch onto the highway? A. Yes.

\* \* \* \* \* \*

"A. *Between the west edge of the east driveway and where this horse is located on the highway would be within 5% of 168 feet and 9 inches.*" (Our italics).

"Q. This horse appeared out of control, did it, Doctor? A. Yes, sir."

An examination of the record discloses that the answer underscored was not given by the defendant, but was a part of the testimony of Sterling Floeck, a brother of the deceased, given for the plaintiff in rebuttal, when he was testifying as an expert insurance adjuster. He was giving his opinion as to the location of the collision with relation to the filling station. He based his testimony on a posed photograph taken with the camera parallel with the road and a map drawn to scale which was not admitted in evidence. The defendant questioned the probative value of the testimony based on such a picture at the time. It is stated in Scott, "Photographic evidence", Sec. 87, p. 92: "When it is desired to show the distance between two objects in a scene, the ideal camera position is one on a line perpendicular to an imaginary line drawn between the important objects."

At 20 Am.Jur. "Evidence", Sec. 727, it is stated: "A photograph cannot be relied on as proof in itself of the dimensions of the depicted object or objects, and cannot be made properly available to establish the relative proportions of such object or . objects except by evidence of the personal knowledge or scientific experience to demonstrate accurately the facts sought to be established."

But we do not need to resort to the books to learn of the unreliable nature of such testimony. We turn to his own testimony on the plaintiff's case in chief of his on-the-spot investigation made two days after the accident when the tire marks and blood stains were plainly visible. We quote therefrom as follows: "It was on the morning before the funeral about 9 or 10 o'clock. I have visited many such scenes in my occupation and as I went out there I took note of a great many things I guess the ordinary person wouldn't notice, * * * When I went out there, on arriving there, I saw a heavy spot of blood on the south side of the pavement. It was a very large spot. It was obvious that it was the blood of the horse. There was too much blood for a man. There was another spot up in the pavement near what would have been a center line of the pavement, had the pavement been lined, near the center of the pavement. Then just a few feet, 10 or possibly 12 feet to the west of that there were two black marks on the pavement. They started close together and as they cut across toward the north or northeast they became separated by about 28 or 30 inches and they came closer together as they went off the pavement on the north side of the road. Those marks could be less visibly traced off the shoulder of the road, which was about 32 to 36 inches wide there, and they then faded out after that. Do you want me to tell where those marks were located on the pavement?

"Q. Yes, if you know about it. A. They were near the Cory-Penn Station out there. They were just east of the east side coming out of the Cory-Penn Station. I measured them at the time. I will give you the measurements if you will give me a minute to think. Those marks were about thirty feet from the east of the Cory-Penn Station to the east, and the blood spot, as I said, was 10 or 12 feet beyond the skid marks and then there was another smaller spot some 8 or 10 feet east of this spot of blood, the large blood spot in the center of the pavement. * * *"

The other witnesses who viewed the scene of the accident placed the horse's body and place of collision approximately 15 to 40 feet from the east driveway.

█ It is, of course, the duty of the trial court to properly instruct the jury on questions of law raised by the evidence in the case, leaving the issues of fact for the jury, but in consideration of all the evidence, particularly the repeated statements of the

widow of the deceased, and in fact the principal plaintiff here, the only eyewitness to the accident who testified, that the collision was apparently unavoidable, the trial court properly refused to submit this issue to the jury. Thayer v. D. & R. G. R. R. Co., 21 N.M. 300, 154 P. 691; Citizen's Finance Co. v. Cole, 47 N.M. 73, 134 P.2d 550; Federal Land Bank of Wichita v. Beck, èt ux., 46 N.M. 87, 61 P.2d 147.

The second assignment of error relates to the refusal of the trial court to give his requested instruction No. 15, as follows:

"You are instructed that the statute law of the State of New Mexico defines a "Business District" as follows: 'The territory contiguous to a highway when fifty (50) percent or more of the frontage thereon for a distance of three hundred (300) feet of (or) more is occupied by buildings in use for business.'

"And that the statute law of the State of New Mexico defines a 'Residence District' as follows: 'The territory contiguous to a highway not comprising a business district when the frontage on such highway for a distance of three hundred (300) feet or more is mainly occupied by dwellings or by dwellings and buildings in use for business.'

"If you find from the evidence that the area surrounding the Corypenn Station fits either of these definitions, then I instruct you that the legal speed limit under the laws of New Mexico is 20 miles per hour in the case of a business district, or 25 miles per hour in the case of a residence district, whether any speed limit sign is posted or not."

This instruction follows the language of the statute, Sec. 68-401, subsecs. (t) and (u), 1941 Comp. Certainly, the area was not a business district under our statutory definition. Was the proof, that the area was a residential district, sufficient to authorize the submission of the question to the jury?

 Our statute defining a residence district is identical with the Wisconsin statute. The Supreme Court of that state in construing their statute in McGill v. Baumgart, 233 Wis. 86, 288 N.W. 799, and in Volland v. McGee, 238 Wis. 598, 300 N.W. 506, held that it is the frontage of the buildings within the 300 foot area that determines whether the scene of an accident is a residence district, and not the combined area of the buildings and yards. The Cory-Penn filling station is the only building shown to front directly on the highway and it has a width of 35 feet.

It is true that one witness testified that the frontage of the little group of buildings around the filling station was approximately 410 to 415 feet, but he did not give the dimensions of any of the buildings and the record is silent on this point except as to the filling station.

The proof shows that there are three residential houses behind the station from 250 to 900 feet back from the highway, with only one of them facing in the direction of the highway. The burden of proof was upon the plaintiff to show by actual measurements that the area occupied by the buildings, *to the exclusion of the vacant yard space,* was more than 50 per cent of the 300 feet area. He failed to meet such burden, and, following the reasoning of the Wisconsin courts, the court did not err in refusing to give the tendered instruction.

The third assignment of error relates to the refusal of the trial court to grant a new trial on the ground of newly discovered evidence. According to the motion, the plaintiff learned on Friday before the trial started the following Monday morning that a Mrs. Frances J. Fazekas was an eyewitness to the collision, but he did not know the nature of her testimony; that arrangements had been made with her to appear at the offie of the plaintiff's attorneys on Sunday and that a subpoena was immediately issued for her appearance as a witness on Monday, but it was not served; that she was injured in an automobile accident on Saturday night preceding the trial and immediately left for El Paso, Texas, and that her whereabouts were not discovered until after the jury had returned its verdict. Her affidavit was attached to the motion for a new trial, the material part of which reads: "On Sunday afternoon, May 26, 1946, I was out for a Sunday afternoon ride with a friend on the rural road around Tucumcari, Quay County, New Mexico. At approximately 5:30 P.M. we were proceeding in a westerly or southwesterly direction along the dirt road which runs parallel to the railroad tracks near the Tucumcari Memorial Cemetery west of Tucumcari, New Mexico, in Quay County. We were riding in a coupe model automobile and I was sitting half way turned on the seat facing toward the driver. This caused me to be looking south toward U. S. Highway 66. We were driving along talking and I was not paying any particular attention to what was going on on U. S. Highway 66, until I heard the screech of tires on the pavement followed by the sound of the impact, at which time I looked up. At that time our car was almost stopped at a point near the Southeastern corner of the Tucumcari Memorial Cemetery and approximaely 500 to 600 feet due north of the scene of the accident. When I looked up the horse and car were coming together, and the horse was hit and spun around into the right side of the car also. Immediately after the impact, Dr. Hoover's car (I believe it was Dr. Hoover's car, although at the time of the accident was not sure who it was) spun into the bar ditch along the North side of the road and came to rest facing West."

The plaintiff used due diligence in contacting the witness and in arranging for a conference to learn what her testimony would be, and also to insure her attendance, and through no fault on his part, she did not appear.

The requirements necessary to obtain a new trial are stated in State v. Luttrell, 28 N.M. 393, 212 P. 739 to be: (1) it must be such as will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be merely impeaching or contradictory to the former evidence.

While we seriously doubt whether such testimony would change the result of the trial, nevertheless, we feel that such testimony would run counter to the former evidence. Her attention was attracted to the scene of the noise of the collision. All of the evidence is to the effect that there were no marks of impact on the front of the defendant's automobile, but, on the contrary, they were on the side, and this is corroborated by the photographs of the automobile. The defendant himself testified that neither the horse nor the deceased struck the front of the car, but that the impact was on the side. Ground 6 furnishes an efficient bar to the claim of error in this regard.

The judgment will be affirmed, and it is so ordered.

BRICE, C. J., and LUJAN, SADLER and McGHEE, JJ., concur.