379 P.2d 458

**Arthur CURLEE, dba The Yellow Cab Company of Phoenix, and Robert James McHugh, Appellants,**

**v.**

**John E. STEWARD and Oritha Steward, his wife, Appellees.**

**No. 6873.**

Supreme Court of Arizona.

In Division.

March 7, 1963.

Rehearing Denied March 26, 1963.

---

Moore, Romley, Killingsworth & Kaplan, and Robert W. Browder, Phoenix, for appellants.

Herbert B. Finn, Phoenix, for appellees.

JENNINGS, Justice.

The appellants were defendants in an action for personal injuries sustained in a collision between a taxi and a pickup truck at an uncontrolled intersection in the City of Phoenix. There was a verdict and judgment for plaintiffs, appellees herein, in the sum of $20,000. Defendants' motion for a new trial was denied and they appealed.

Oritha Steward was a passenger in her husband's pickup truck at the time of the collision. The truck, driven by the plaintiff

John E. Steward, had just passed through a school zone and had slowed to 15 mph although school was not in session and there were no signs requiring a reduced speed. The truck increased speed slightly as it approached the intersection of Adams Street and North 18th Street from the east. Steward's view to the north was obstructed by a building near the northeast corner of the intersection. As he passed the edge of this building, Steward observed the taxi driven by defendant McHugh approaching rapidly from the north. Steward applied his brakes and skidded to a stop in the intersection. McHugh also applied the brakes of the taxi and skidded into the intersection where the left front of his vehicle collided with the right front of the Steward pickup.

Steward estimated that the taxi was about 100 feet north of the intersection when he first saw it. The taxi's speed was estimated by its driver to be 25 to 28 mph, and by plaintiffs' expert, who based his views upon the 53 feet of skid marks laid down by the taxi, to be from 23 to 30 mph or slightly higher.[1] The pickup's speed be-

fore the brakes were applied was estimated from 22 feet 7 inches of skid marks at between 12½ and 18½ mph.[2] There was no posted speed limit on either street. Other facts will be given in connection with the discussion of defendants' assignments of error.

Defendants' first assignment is that the court erred in instructing the jury on the prima facie speed limit in a business or residential district, for the reason that there was not sufficient evidence from which the jury could find that on the date of the accident 18th Street, for a distance of 300 feet north of its intersection with Adams Street, was a business or residential district as defined in A.R.S. §§ 28–107 and 28–136. The evidence on this point was as follows: It is undisputed that there was a large building near the northeast corner of the intersection utilized as a soft drink bottling plant. Defendant McHugh testified that there were houses on the southeast and southwest corners of the intersection. Steward testified that he passed through a school zone on Adams Street shortly before he reached the intersection. In addi-

---

1. An estimate of between 25 and 30 mph was given, assuming the pavement was completely covered with gravel. (The investigating officer testified that there was an accumulation of loose gravel in the intersection and perhaps on the traveled portions of the streets.) This estimate would be reduced to 23 to 25 mph if the skid marks had been measured from the point of impact, because it is necessary

to deduct the wheelbase of the car. Because the taxi skidded 9 feet after impact, these figures would be raised, but the expert did not give a figure in miles per hour.

2. An estimate of 16½ to 18½ mph was given which would be reduced to 12½ to 14 mph if the skid marks were measured from the point of impact, requiring allowance for the pickup's wheelbase.

tion, the following testimony was given by the investigating officer:

"Q What type of district was that in—

"MR. KAPLAN: I object, it is a question of law.

"THE COURT: That calls for a conclusion, you will have to ask what buildings were around there.

"MR. FINN: I accept that.

"Q Do you recall what the speed zone was?

"MR. KAPLAN: Same question, question of law.

"MR. FINN: I believe he's capable of testifying as to the speed law.

"THE COURT: No, if there were posted signs he can say what they said. Otherwise it depends on the type of buildings there and type of neighborhood.

"MR. FINN: Q What type of buildings were there in the neighborhood?

"THE WITNESS: Predominantly residences."

Finally, an expert called by the plaintiff testified:

"Q Mr. Johnson, are you familiar with the intersection at 18th Street and Adams in Phoenix, Arizona?

"A Yes, I am.

"Q What type of buildings surround that area in that area?

"A The buildings are relatively old, the only permanent type of construction is on the northeast corner, which is an old brick building that's been there for some time, on the other corners are old residential type of buildings." [3]

This court has not previously construed A.R.S. § 28–136.[4] The defendants advocate the adoption of a construction like that given by the New Mexico Court to their similar statute. In Floeck v. Hoover, 52 N.M. 193, 195 P.2d 86 (1948) that court stated:

" * * * The burden of proof was upon the plaintiff to show by actual measurements that the area occupied by the buildings, to the exclusion of

---

3. Although this witness did not view the area until near the time of trial, several other witnesses testified that the intersection had not changed between the accident and the time of trial. Moreover, no objection was made to this testimony by the defendants.

4. "§ 28–136. Residence district
" 'Residence district' means the territory contiguous to and including a highway not comprising a business district when the property on the highway for a distance of three hundred feet or more is in the main improved with residences or residences and buildings in use for business."

**184**

the vacant yard space, was more than 50 per cent of the 300 feet area." 195 P.2d at 89.

Other cases cited in support of the defendants' contention are collected in Annot. 50 A.L.R.2d 343.

Several authorities, in our opinion with better reasoning, have rejected the mathematical approach and the percentage of frontage test used by some courts. In Baker v. Court of Special Sessions, 125 N.J.L. 127, 15 A.2d 102 (1940) the court answered the contention that the words "mainly occupied" in their similar statute meant fifty per cent of the frontage must be occupied by buildings, saying:

> " * * * we are unable to take that view of the matter. If it were to prevail, it would mean that where a locality had been laid out into a series of large and handsome places, with average frontage of say 200 feet each, one house on each lot, it could not be classed as 'residential' in the intendment of the statute, unless more than 50 per cent. of the total frontage was occupied by residences." 15 A.2d at 103.

The court held that evidence of ten residences within a district one-third of a mile

long, which was colloquially known as a residential district, was sufficient to establish residential character within the meaning of their statute.

In Gordon v. Cozart, 110 So.2d 75 (Fla. App.1959) a Florida appeals court construed a definition of residential district essentially identical to our own. It noted the different approach used by the legislature in defining "business district" and "residential district":

> " * * * The very fact that our legislature did adopt a rigid formula in defining a business district in the same statute would indicate that the failure to do so in defining residence district was a conscious attempt to provide a more elastic rule in relation thereto." 110 So.2d at 77.

A similar contrast between these definitions can be seen by comparing A.R.S. § 28–136 with the definition of "business district" in A.R.S. § 28–107.[5] In the Florida case the evidence was that the area contained "a used car lot, a grocery store, and a few dwellings and other miscellaneous buildings * * * the exact number and location of which were somewhat in dispute." The court held it was not error to submit the

5. "§ 28–107. Business district
" 'Business district' means the territory contiguous to and including a highway when within any six hundred feet along such highway there are buildings in use for business or industrial pur-poses, including but not limited to hotels, banks or office buildings, railroad stations and public buildings which occupy at least three hundred feet of frontage on one side or three hundred feet collectively on both sides of the highway."

question of the character of the area to the jury.

■ The determination of what is a residential district for the purpose of applying the speed laws is not to be made with the surveyor's chain. The standard must be practical enough to be applied by a motorist as he approaches a built-up area along his road of travel. In most circumstances, it is a jury question whether a particular area is "mainly improved" with residences or business buildings.

■ In the present case we may consider a three hundred foot section of 18th Street, centered upon the intersection with Adams, as the area in question. As the width of the pavement on Adams Street was 24 feet, this means an area extending 138 feet north and 138 feet south along 18th Street measured from the edge of the paving on Adams Street. The evidence showed there were in this area one large building used as a soft drink plant and two or more residences, and that there were other residences and a school nearby. We think the jury could conclude from this evidence that the area was a residential district within the meaning of the statute.

In their second assignment the defendants contend that the court erred in giving this instruction:

"You are instructed that the law of this state provides the driver of a vehicle approaching the intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway. If you find that the defendant McHugh, the taxi driver, violated that statute, then I instruct you that such conduct on the part of the defendant McHugh is negligence * * *."

The defendants argue that this instruction has no application to the evidence in this case, and misstated the law by telling the jury that plaintiffs had the right of way if plaintiffs' truck entered the intersection first.

It is undisputed that the Steward pickup entered the intersection before the taxi driven by McHugh did. Nevertheless, defendants contend that A.R.S. § 28–771, subd. A [6] upon which the instruction was based does not apply. The "first to enter" provision of this subsection applies, they assert, only when a vehicle enters an intersection sufficiently ahead of cars approaching from the right so that, in the judgment of its driver as a reasonably prudent man, it can cross the intersection without danger of collision with cars on the right. In other cases the "approximately the same time"

6. "§ 28–771.
   "A. The driver of a vehicle approaching an intersection shall yield the right of way to a vehicle which has entered the intersection from a different highway."

rule of A.R.S. § 28–771, subd. B [7] applies and requires the driver on the left to yield to the driver on the right, even though he may actually enter the intersection slightly ahead of the driver on the right. Any other rule, they claim, would encourage madcap races for intersections in an effort to win the right of way by being the first to enter. They cite numerous authorities in support of their position, e. g., Gendron v. Glidden, 84 N.H. 162, 148 A. 461 (1929); McNaught v. Smith, 127 Conn. 450, 17 A.2d 771 (1941); Walkup v. Bardsley, 111 F.2d 789 (8th Cir., 1940); Moore v. Kujath, 225 Minn. 107, 29 N.W.2d 883, 175 A.L.R. 1007 (1947).

■ These cases stand for the correct proposition that, under circumstances where two vehicles enter an intersection at approximately the same time, although the driver on the left enters slightly ahead of the driver on the right, the driver on the left may be found to have violated the right of way rules. See Hall v. Wallace, 59 Ariz. 503, 130 P.2d 36 (1942).[8] The principles established by these authorities cannot be extended to the extreme urged by the defendants however, and applied to exonerate the driver on the right of any violation of the first provision of the statute. To do so would render A.R.S. § 28–771, subd. A. meaningless as the driver on the right would never have to yield. Whenever the driver on the left failed to make it across, ahead of the car on the right, it would indicate that he violated A.R.S. § 28–771, subd. B. and thus, by defendants' reasoning, that the driver on the right did not violate A.R.S. § 28–771, subd. A. This is a non sequitur. Defendants are not absolved from violation of the statute just because the plaintiffs may have violated another section of it. It may occur that neither party to an accident is given the right of way by the law, Wellman v. Moes, 14 Wis.2d 18, 109 N.W.2d 496 (1961).

■■ There was evidence in this case to support the instruction quoted above. The jury could have found that at the time the Steward pickup entered the intersection McHugh's taxi was sufficiently north of the intersection that, if he had driven in a reasonable and prudent manner, he should and could have yielded the right of way to Steward. The trial court properly gave the quoted instruction, and also one in the terms of A.R.S. § 28–771, subd. B. which permitted the jury to find that Stew-

---

7. "§ 28–771.
  "B. When two vehicles enter an intersection from different highways at approximately the same time the driver of the vehicle on the left shall yield the right of way to the vehicle on the right."

8. In that case we held that the jury could not reasonably find a car on the right 400 feet from the intersection was entering it at "approximately the same time" as a truck which had begun to cross the highway.

ard had violated its provisions. Furthermore, we do not agree with the defendants that the instruction required the jury to find in favor of Steward if they found he entered the intersection first. Taken together, the two instructions simply stated the rules of both provisions of A.R.S. § 28–771 and permitted the jury to apply either or both as they saw fit.

Defendants next complain that the trial court allowed the jury to compensate the plaintiffs for the reasonable value of the time Oritha Steward lost from her employment from the date of her injury to the date she was able to resume work, for the reason that there was no evidence as to the amount of prior earnings or as to the dollar and cents value of the time she lost, leaving the jury to guess or speculate on the amount to award for this item.

The testimony showed that Oritha Steward had worked as a janitress and taken in laundry for several years prior to the accident. However, there was no evidence as to the actual amount of her prior earnings.

■ Defendants failed to object to the instruction which permitted compensation for this element of damage at the time instructions were settled by the court.[9] We do not find this to be a case where the error is so fundamental as to require correction in spite of counsel's failure to call it to the attention of the trial court. We therefore do not consider this assignment of error, Ariz.Rules Civ.Proc. Rule 51(a), 16 A.R.S.; Musgrave v. Githens, 80 Ariz. 188, 294 P.2d 674 (1956).

Defendants' final assignment is that the award of $20,000 is so excessive it could only have been given under the influence of passion or prejudice.

■ The evidence showed that plaintiffs had incurred $871.41 in medical bills. Claim was made for loss of earnings for some indefinite period possibly continuing until the time of trial. (Plaintiff claimed to be incapacitated at the time of the trial. The defendants contended she could have resumed work earlier and the question was left to the jury.) In relation to damages for pain and suffering, the evidence showed that a psychosomatic condition resulted from the accident which required repeated treatment by electric and insulin shock. These treatments were said to induce conditions similar to epileptic seizures. Following her recovery from this condition, Oritha Steward lost all memory of events during the period of her illness and treatment. Based upon this evidence, and the entire lack of any manifestations of passion or prejudice, or any event that would cause passion or prejudice in the jury dur-

9. Defendants' objections to the instruction on other grounds were satisfied by modifications made by the court. The record fails to show any objection to the instruction as modified.

ing the course of the trial, we cannot say these damages are flagrantly excessive, Stallcup v. Rathbun, 76 Ariz. 63, 258 P.2d 821 (1953).

The judgment is affirmed.

UDALL, V. C. J., and STRUCK-MEYER, J., concur.